UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE TRACKING OF ONE GRAY 2008 TOYOTA SIENNA, NEW YORK LICENSE PLATE NUMBER EEC7528, VEHICLE IDENTIFICATION NUMBER 5TDZK23C18S106338 | No. 2:24-mj-64-KFW<br><br>FILED UNDER SEAL |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION
FOR A TRACKING DEVICE WARRANT**

**Filed Under Seal Pursuant to Local Rule 157.6(a)**

I, George T. Cayer, being duly sworn, depose and state as follows in support of a search warrant sought pursuant to Federal Rule of Criminal Procedure 41 and Title 18, United States Code, Section 3117:

### Introduction

1. I am a sworn Task Force Officer ("TFO") with the Federal Bureau of Investigation ("FBI"), and have been since April 2022. I am presently further employed as a Detective Sergeant for the Rumford Police Department, Deputy Sheriff for the Oxford County Sheriff's Office and the Androscoggin County Sheriff's Office, and a Deputy U.S. Marshal. As an FBI TFO, I am authorized to investigate violations of the laws of the United States, including those concerning drug involved-premises and trafficking. As a TFO, I am a law enforcement officer with authority to execute arrest and search warrants under the authority of the United States.

2. I make this affidavit in support of an application for a search warrant to authorize the installation and monitoring of a tracking device on a **gray 2008 Toyota Sienna bearing New York State license plate number EEC7528 and vehicle identification number 5TDZK23C18S106338** (the "SUBJECT VEHICLE").

1

3. Based on the facts set forth in this affidavit, I believe that the SUBJECT VEHICLE is presently being used in furtherance of violations of the federal drug-involved premises statute (21 U.S.C. § 856(a)), as well as for the illegal distribution of marijuana (21 U.S.C. § 841(a)(1)). I submit that there is probable cause to believe that the installation of a tracking device on the SUBJECT VEHICLE and use of the tracking device will lead to evidence of such crimes, to contraband, fruits, and instrumentalities of the crimes, and to property designed for use, intended for use, or used in committing a crime, as well as to the identification of individuals who are engaged in the commission of those and related crimes.

4. The facts set forth in this affidavit are based on my personal knowledge, information obtained during my participation in this investigation, and information from others, including other full time agents and TFOs of the FBI, Drug Enforcement Administration ("DEA"), Department of Justice personnel, and the analysts and contractors of said federal agencies who conducted additional investigations into the subject matter of this criminal activity, all of whom I believe to be truthful and reliable. My review of documents and records related to this investigation, all of which I believe to be reliable, provide additional bases for the facts set forth in this affidavit. My affidavit is intended to provide the facts necessary for a determination of probable cause for the requested search warrant.

### Affiant Background and Experience

4. I have more than forty-three years of law enforcement experience. I have successfully investigated and handled marijuana investigations such as the one described herein. I have testified in federal and state court in numerous criminal cases.

5. I am a graduate of the Maine Criminal Justice Academy. I have worked for the Rumford Police Department and held various ranks to include Sergeant, Detective Sergeant and Lieutenant, and have handled crimes including but not limited to illegal marijuana grows. I also worked as an International Police Officer for the United Nations for one year and obtained the positions of Detective and Chief of Investigations. I worked nine years for the Oxford County Sheriff's Office and investigated felony criminal cases during my tenure there as a Patrol Deputy and Corporal.

6. During the course of my experience, I have drafted and executed numerous search and arrest warrants and assisted many others. I have attended state law enforcement training courses, both related to criminal investigation in general and conducting undercover drug investigations. In the course of my law enforcement training and experience, I have had an opportunity to author and execute several cellular telephone, iPad and computer search warrants on suspects in the state of Maine who were involved in criminal activity relating to drug trafficking. I have participated in several search warrants, drafted search warrants, and have assisted in the execution of search warrants in which felony drug crimes were uncovered.

7. In my training and experience, the investigation of illegal drug operations often benefits from the review of digital evidence, including data obtained through or on the basis of global positioning system ("GPS") technology.[1]

---

[1] The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

8. In my training and experience, the authorized use by law enforcement of electronic or mechanical devices permitting the GPS tracking of the movements of a person or object—such as the tracking device on a motor vehicle at issue here—may yield evidence of drug trafficking, distribution, and transportation, show patterns of behavior, and assist in the confirmation and/or additional identification of participants in the criminal activity.

### Affiant Knowledge of Marijuana Cultivation, Manufacturing, Distribution, and Trafficking

5. Based on my training and experience, I have knowledge regarding the identification, location, and investigation of marijuana growing operations, and can recognize common methods used to cultivate marijuana and the kinds of equipment used in marijuana growing operations. I know that the cultivation of marijuana inside a structure, such as a residential dwelling, requires the regulation of heat, moisture, humidity, and oxygen within the structure. Indoor marijuana cultivation requires the use of numerous high intensity lights, often of the high voltage variety. I also know indoor grows often require a form of a regulated ventilation system, to provide fresh air and to exhaust extra heat and humidity. The constant use of this type of grow equipment results in a high consumption of electricity. Structures also will often be modified to accommodate the extra vents and electrical demands. Windows will often be covered from the inside to prevent detection by law enforcement, or as a result of altering the interior of the structure to accommodate the grow rooms.

6. Through my training and experience, I can recognize marijuana plants in various stages of live growth as well as when the plants have been harvested and processed for sale and ingestion.

7. I know, for example, that the grow cycle of a marijuana plant when cultivated indoors can range from two to four months, and will involve the three growing stages of germination/seedling, vegetative, and flowering. I am also familiar with the unique appearance and odor of fresh growing marijuana, as well as dried processed marijuana bud, and other parts of the marijuana plant. I can also recognize the odor of marijuana that is being ingested by burning. Once harvested and processed for sale, the finished product must be transported from the grow house for distribution.

8. Indoor marijuana growing operations also require a large amount of equipment and supplies, in my training and experience. The type of equipment used to grow marijuana indoors usually involves large lights, electrical cords, water trays, PVC piping, water pumps, hoses, chemicals, and fertilizers, as well as light shields, dehumidifiers, air filtration and conditioning units, potting soil or other grow medium, and potting. This equipment is bulky and easily recognizable, and requires transportation to and from grow sites.

9. Based on my training and experience, I know that the illegal distribution of marijuana is a high profit business where revenue is usually received in the form of cash. As such, large-scale marijuana cultivation operations almost always result in the receipt and subsequent possession of very large quantities of cash. Such cash is often stored in a variety of ways. For example, it is a practice known to me for drug traffickers to hide and transport bulk cash in vehicles.

10. I also have become familiar with certain methods of operation employed by narcotics traffickers operating at the local and statewide level, including those involving the distribution, storage, cultivation and transportation of marijuana and the collection of money that constitutes the proceeds of the narcotics trafficking activities.

As a result, I am familiar with the general characteristics of narcotics distribution "cells." A distribution cell consists of two or more individuals who work in concert for the sole purpose of the distribution of large amounts of narcotics. Distribution cells consist of workers, supervisors, and managers. They are often surveillance-conscious and have a working understanding of methods used by law enforcement agencies to investigate their illegal activities.

## Probable Cause

7. The FBI, in coordination with the Drug Enforcement Administration ("DEA") and other federal and state law enforcement agencies, is investigating individuals, entities, and premises involved in a suspected large-scale coordinated series of illegal marijuana grows in the state of Maine. The drug-involved premises at issue are believed to operate in violation of 21 U.S.C. § 856(a), in addition to illegally cultivating for distribution marijuana in violation of 21 U.S.C. § 841(a)(1). All such premises under investigation, including that at issue here, have been confirmed by the Maine Office of Cannabis Policy ("OCP") as lacking any licensed status under which marijuana could be legally cultivated under state law.

8. Among the premises suspected by federal investigators of maintaining illegal marijuana grows, the investigation identified a residential property located at 56 Pine Street, Mexico, Maine.

9. The DEA issued administrative subpoenas to Central Maine Power ("CMP") seeking electrical usage and billing data for 56 Pine Street, Mexico. Information returned by CMP showed that the property had one customer account held in the name of KUN YU CHEN from November 2021 through September 2022.

10.  CMP's electricity usage and billing records for 56 Pine Street, Mexico show as follows for that same time period:

| Month & Year | Power Usage (kWh) | Billed Amount (USD) |
|---|---|---|
| November 2021 | 128 | 29.77 |
| December 2021 | 224 | 44.95 |
| January 2022 | 203 | 51.07 |
| February 2022 | 213 | 54.64 |
| March 2022 | 213 | 54.64 |
| April 2022 | 243 | 60.99 |
| May 2022 | 136 | 38.32 |
| June 2022 | 1,748 | 379.78 |
| July 2022 | 7,638 | 1,591.69 |
| August 2022 | 8,386 | 1,736.13 |
| September 2022 | 7,175 | 1,486.77 |

11.  XIANDU ZHANG became the customer of the CMP account for 56 Pine Street, Mexico, in September 2022, and remains so. CMP's electricity usage and billing records for 56 Pine Street, Mexico show as follows for October 2022 through January 2024:

| Month & Year | Power Usage (kWh) | Billed Amount (USD) |
|---|---|---|
| October 2022 | 8,895 | 1,840.93 |
| November 2022 | 6,825 | 1,414.70 |
| December 2022 | 8,206 | 1,699.06 |
| January 2023 | 13,380 | 3,419.84 |
| February 2023 | 17,995 | 4,737.16 |
| March 2023 | 16,668 | 4,388.52 |
| April 2023 | 31,123 | 8,186.28 |
| May 2023 | 34,725 | 9,132.63 |
| June 2023 | 37,017 | 9,734.81 |
| July 2023 | 41,868 | 10,997.98 |
| August 2023 | 38,529 | 9,911.98 |
| September 2023 | 45,262 | 11,641.07 |
| October 2023 | 41,674 | 10,719.64 |
| November 2023 | 52,494 | 13,498.32 |
| December 2023 | 43,655 | 11,228.38 |
| January 2024 | 47,689 | 9,788.46 |

11.  As previously detailed above, I know based on my training and experience that the utilization of such large amounts of electrical power—evidenced by that

7

presently used at 56 Pine Street, Mexico—are needed in support of indoor marijuana cultivation, due to the use of artificial lighting, heat pumps, distribution fans, air conditioners and humidifiers. The electrical consumption at 56 Pine Street, Mexico, is indicative of a large-scale illegal marijuana operation.[2] Notably, the most monthly power used between January 2020 and November 2021 by the prior CMP account holder of 56 Pine Street, Mexico, before KUN YU CHEN and XIANDU ZHANG, was 2,467kWh. Beginning in July 2022, and again in April 2023, I believe that the dramatic increases in the power usage rate indicate an increase in the scale and capacity of a marijuana grow operation.

12. I am personally familiar with 56 Pine Street, Mexico, through my professional and personal experience in and around the Mexico area and Oxford County, and know it to be single-family residence with a separate three-bay garage. The separate garage was at one time utilized as the Western Maine Transportation Garage. Based on open source Internet research I performed on February 20, 2024, using Google Maps, which I believe to be reliable, 56 Pine Street, Mexico is approximately 950 feet from Mountain Valley Middle School, in Mexico, which is located north up Highland Terrace.

13. Provided below is a photograph of the residence and detached garage available on the commonly used real estate website Redfin,[3] which accurately shows the current condition and proportions of the property:

---

[2] For comparison, according to the Energy Information Administration, the average American home uses an average of 10,632 kilowatt-hours (kWh) of electricity per year, or 863 kWh per month.

[3] *See* https://www.redfin.com/ME/Mexico/56-Pine-St-04257/home/100078822. Redfin indicates that the residence has "5 bedrooms, 1 1/2 baths, 2 family rooms, a laundry room and a 3 bay commercial garage with massive storage above it." *Id.*



14.     I have further reviewed publicly available real property records concerning the acquisition and ownership of 56 Pine Street, Mexico.

15.     The warranty deed for the property recorded with the Oxford County Register of Deeds shows that on November 8, 2021, the real property located at 56 Pine Street, Mexico, was granted to KUN YU CHEN, of Quincy, Massachusetts. Town of Mexico property and tax records provided to me by Mexico Police Chief Roy Hodsdon confirm KUN YU CHEN's current ownership of the property.

16.     On February 12, 2024, I, along with FBI TFO Daniel Garbarini (Rumford Police Department) drove to 56 Pine Street, Mexico, and noted a clear path between the residence and large unattached garage building. I observed that the large two-story garage located behind the residence has a ventilation system on the northeast corner on the second story. Ventilation was actively occurring. I also observed behind the residence and the detached garage several large black industrial style garbage bags, commonly called "contractor bags," stacked on each other, which I estimated to be thirty bags in total.

17. I further observed the SUBJECT VEHICLE, a gray 2008 Toyota Sienna bearing New York State license plate number EEC7528, which a registration check I performed showed had a vehicle identification number of 5TDZK23C18S106338 and listed GUO HONG LEI, of Brooklyn, New York, as the registered owner.

18. The windows of the premises, both the residence and the garage are completely covered with a black material, possibly the large black construction bags they are known to use. The windows are covered from the inside. As previously detailed, this is a method commonly employed by illegal marijuana growers, both to avoid law enforcement detection and also to regulate the lighting of the grow space.

19. On February 16, 2024, I arranged for a pole camera to be installed on an area of property adjacent to the back portion of the 56 Pine Street, Mexico, parcel. On such date, I utilized the pole camera to capture photographs of the back of the property,



the mailbox of the property,



the garage, which I observed to be in the process of actively venting,



black garbage bags behind the residence,



Black garbage bags behind the garage,



and the SUBJECT VEHICLE in the driveway:



20.     On February 16, 2024, I was a recipient of an email sent by OCP personnel, in which OCP confirmed that there were no registered or licensed cannabis activities at 56 Pine Street, Mexico, and no applications pending. OCP further provided that two individuals had been issued Individual Identification Cards showing 56 Pine Street, Mexico, as their mailing or physical address. OCP noted that while an Individual Identification Card authorizes the holder to be employed in a licensed adult use cannabis program, it does not allow them to do anything except work for a lawful licensee. He reiterated that there were no licensed activities at 56 Pine Street, Mexico.

21.     One of the two individuals identified by OCP was GUO HONG LEI, the registered owner of the SUBJECT VEHICLE. OCP provided the following picture of GUO HONG LEI, which had been submitted in connection with his Individual Identification Card application:

13



22. From the photograph provided by OCP, I recognize GUO HONG LEI to be the same individual I have consistently observed via pole camera photographs (sampled below) as one of several individuals going in and out of 56 Pine Street, Mexico, throughout each day since February 16, 2024:



23. On February 27, 2024, at approximately 4:07pm, I observed two unknown individuals removing multiple large black garbage bags from the garage and taking the bags to the rear of the residence at 56 Pine Street, Mexico. I observed one unknown individual make several trips and counted the bags he removed from the site, a minimum of 43 bags. I also observed the other unknown individual helping.

24. Based on my training and experience and what I have learned from others who have expertise in the field of illegal marijuana cultivation, I believe the bags contain discarded growing roots and trimmings from a recent harvest.

25. At approximately 6:30pm on February 27, 2024, after checking the wind direction, I drove to 56 Pine Street, Mexico, and slowly passed the residence in both directions traveling Highland Terrace. I detected the odor of unburnt marijuana as I drove past the residence.

26. On February 27, 2024, at approximately 7:00am, I observed two of the unknown individuals transporting what appeared to be new trays of seedlings into the garage at 56 Pine Street, Mexico.

27. Further to the investigation, I obtained License Plate Reader data from reliable law enforcement databases, querying the New York State license plate number (EEC7528) of the SUBJECT VEHICLE for the date range January 1, 2023, through February 21, 2024. The data returned showed that the SUBJECT VEHICLE was captured on traffic cameras on the Bronx Whitestone Bridge on January 15, 2024; January 15, 2024; August 25, 2023; July 24, 2023; July 17, 2023; June 7, 2023; June 3, 2023; and January 27, 2023.

* * * * *

28. Based on the foregoing facts, there is probable cause to believe that violations of 21 U.S.C. §§ 856 (Drug-Involved Premises) and 841(a)(1) (Drug Manufacturing and Distribution) exists with respect to the SUBJECT VEHICLE as well as 56 Pine Street, Mexico.

29. Constant law enforcement surveillance of the SUBJECT VEHICLE is risky and is also cost-prohibitive in this situation. The use of an electronic tracking device, however, may be utilized to provide constant electronic surveillance of the movements of the SUBJECT VEHICLE and to alert me and other investigating officers when it travels within Maine or across state borders to various locations to deliver marijuana for distribution, when the subject vehicle visits other properties, and places where co-conspirators may operate this criminal activity. Agents will monitor and record the subject vehicle's movements in live-time and not only confirm the location of the co-conspirators' locations, but also alert officers when the subject vehicle makes the return trip to Mexico, Maine, or other locations with marijuana.

30. This live-time and critically important information would provide officers the opportunity to establish surveillance in the area and take appropriate enforcement action when the investigative goals have been met. The electronic surveillance device to be used in this case is a device that will electronically record into memory all movement activities of the SUBJECT VEHICLE providing precise address/mapping information, with speed, date and time information utilizing GPS. The tracking device I intend to utilize is self-contained with a long-lasting battery pack.

31. Agents can also make a data-call into the unit via cellular technology to download the stored data and/or to monitor the subject vehicle's movements in live real-time. This technology essentially serves the same role as a law enforcement officer in a vehicle conducting constant surveillance.[4]

32. I further submit that the SUBJECT VEHICLE is frequently located at a premises actively engaged in large-scale illegal marijuana cultivation. I know from my training and experience, as well as from information provided to me by other experienced federal and state drug investigators, that such extensive marijuana cultivation operations are complex and often require collaboration with multiple involved individuals, rather than a single grower. The grow operation at 56 Pine Street, Mexico, thus likely requires outside coordination with other participants or co-conspirators, including those associated with other possible illegal marijuana grows elsewhere in Maine and out of state.

33. Specifically, the illegal grow operations at issue require labor, supplies, and transportation in connection with the cultivation, harvesting, processing, and distribution of the marijuana. I believe that the tracking device warrant sought herein will reveal evidence of such activities, including of the fruits and instrumentalities of the illegal activities. Moreover, given the for-profit nature of illegal marijuana cultivation, and the likelihood that illicit proceeds were generated from such activities, I believe that the tracking device warrant sought herein will reveal evidence concerning the monetary proceeds of the marijuana enterprise.

---

[4] I emphasize, however, that this device does not have the capability to intercept, monitor or record any conversations or other audible sounds.

34. Finally, I have learned that Toyota Sienna minivans have consistently appeared in the federal investigation as a common make and model utilized at other illegal grows recently discovered in Maine. Three Toyota Sienna minivans, for example, were registered to an individual associated with a recently reported Penobscot County Sheriff's Office search warrant execution in Passadumkeag. *See* https://www.bangordailynews.com/2024/02/23/penobscot/penobscot-police-courts/passadumkeag-illegal-marijuana-operation-raid/.

35. Based on my own personal observations, I know that the SUBJECT VEHICLE is presently within the District of Maine. In order to track the movement of the SUBJECT VEHICLE effectively and to decrease the chance of detection, I seek authorization to place a tracking device on the SUBJECT VEHICLE while it is in the District of Maine. Because the individuals identified above sometimes park the SUBJECT VEHICLE in the driveway areas and on other portions of the private property comprising 56 Pine Street, Mexico, it may be necessary to enter onto such private property and/or move the SUBJECT VEHICLE to effect the installation, repair, replacement, and removal of the tracking device.

36. To ensure the safety of the executing officer(s) and to avoid premature disclosure of the investigation, it is requested that the court authorize installation, maintenance, and removal of the tracking device during both daytime and nighttime hours. Because of the covert nature and safety risk to law enforcement personnel in these types of investigations, it is usually desirable and necessary to make installation of the electronic tracking device to the suspect vehicle under the cover of darkness and to avoid detection and to prevent the case from being compromised.

37. Further, with these types of covert criminal investigations, it is unreasonable for law enforcement to notify the suspect of the fact that a warrant to install the electronic tracking device is being executed. For these reasons, I believe it is reasonable and necessary to request that a warrant, if issued, permits installation either in the daytime or nighttime, and without the requirement of providing the suspect immediate notice of the execution of this warrant.

38. In the event the Court grants this application, there will be periodic monitoring of the tracking device during both daytime and nighttime hours for a period not to exceed 45 days following issuance of the warrant. The tracking device may produce signals from inside private garages or other such locations not open to the public or visual surveillance

## CONCLUSION

39. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 3117, that authorizes Special Agents and TFOs of the FBI or their authorized representatives, including but not limited to other federal and state law enforcement agents and technicians assisting in the above-described investigation, to install a tracking device on the SUBJECT VEHICLE within the District of Maine within 10 days of the issuance of the proposed warrant, to maintain, repair, and/or replace the tracking device as necessary, and to remove the tracking device from the SUBJECT VEHICLE after the use of the tracking device has ended; to install, maintain, and remove the tracking device during both daytime and nighttime hours; to surreptitiously enter onto the private property of 56 Pine Street, Mexico, and/or move the SUBJECT VEHICLE to effect the installation, repair, replacement, and removal of the tracking device; and to monitor the

tracking device for a period of 45 days following the issuance of the warrant, including when the tracking device is inside private garages and other locations not open to the public or visual surveillance, both within and outside the District of Maine.

40. In accordance with 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), I further request that the notification of the execution of the warrant be delayed for 30 days after the end of the authorized period of tracking (including any extensions thereof) because there is reasonable cause to believe that providing immediate notification may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice would seriously jeopardize the ongoing investigation by prematurely revealing its existence and giving suspects an opportunity to flee from prosecution, destroy or tamper with evidence, intimidate potential witnesses, notify confederates, and change patterns of behavior.

George T. Cayer
FBI Task Force Officer

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedures

Date: Mar 01 2024

City and state: Portland, Maine

Karen Frink Wolf, U.S. Magistrate Judge
Printed name and title